Irina Shpigel
Shpigel and Associates, P.C.
*Attorneys for Plaintiff*
250 Greenwich Street, 46th Floor
New York, New York 10007
E-mail: ishpigel@iselaw.com
T 212-390-1913
F 646-355-0242

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BORIS KOTLYARSKY, an individual, | |
| Plaintiff, | Civil Action No. |
| - against- | **COMPLAINT FOR DAMAGES** |
| UNITED STATES DEPARTMENT OF JUSTICE, a Governmental federal agency, PREET BHARARA, in his official capacity, and JAMES COMEY, in his official capacity | |
| Defendants. | |

Plaintiff, BORIS KOTLYARSKY (hereinafter referred to as "Plaintiff"), by and through

undersigned counsel, alleges upon information and belief the following against Defendants

UNITED STATES DEPARTMENT OF JUSTICE, a Governmental federal agency,

PREET BHARARA, in his official capacity, and JAMES COMEY, in his official capacity

; (collectively referred to as "Defendants").

## PRELIMINARY STATEMENT

1. This is an action pursuant to 42 U.S.C. Section 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution. Defendants engaged in a baseless and malicious prosecution of Plaintiff which resulted in a  gross miscarriage of justice orchestrated by Defendants, in their official capacity; Comey as the director of the FBI, and Preet Bharrara, in his capacity as the U.S. Attorney for the Southern District of New York.

2. Plaintiff BORIS KOTLYARSKY'S claims arise from the malicious prosecution that was achieved through numerous violations of Plaintiff's Constitutional rights under *Brady v. Maryland*, 373 U.S. 83(1963).  The FBI under the direction of James Comey, provided misleading information that led to the arrest of an  innocent man, BORIS KOTLYARSKY in order to protect an FBI informant: would be murderer, Anatoly Potik. While Anatoly Potik, who hired a hit man to kill his son-in-law walked out a free man, BORIS KOTLYRSKY, the hero who blew the whistle on the killer's plot, was arrested on fabricated extortion charges and served forty-one 41 months in prison.  The Government, under the direction and supervision of Preet Bharrar withheld critical exculpatory testimony of Boris Nayfeld (the "hitman" hired by the victim's father-in-law, Anatoly Potik, to kill the victim, Oleg Mitnik), in violation of *Brady*.

3. Meanwhile, the Government dropped the charges against Anatoly Potik, the person who masterminded and paid for the murder of Oleg Mitnik. Even the hit-man who accepted employment to kill Mr. Mitnik, was offered a light sentence guideline and below guideline recommendation by the Government and consequently only served 23 months.

4.  The government destroyed Mr. Kotlyarsky's life, reputation and livelihood and used him as a scape goat to protect their informant, Anatoly Potik, by filing false charges against Boris Kotlyarsky and failing to disclose favorable evidence that is material to his criminal matter. *Brady*, Id. 373 U.S. at 87. Accord: *Gantt v. Martuscello*, 2013 U.S. Dist. LEXIS 183258, 35 (N.D.N.Y. 2013).

5.  Accordingly, Plaintiff brings this action for violations of his constitutional rights, malicious prosecution, and negligent infliction of severe emotional and mental distress and seeks monetary compensation in an amount not less than $250 million dollars.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1331, as this case arises under the United States Constitution and federal statutes. On information and belief, all parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the district.

## THE PARTIES

7.  Plaintiff, Boris Kotlyarsky ("Plaintiff") is a United States citizen. Plaintiff is a resident of the County and State of New York.

8.  Defendant The United States Department of Justice is a United States federal agency.

9.  Defendant Preet Bharrara, was the United States Attorney for the Southern District of New York. The United States Attorney is the chief federal law enforcement officer in his district. Bharrara is sued in his official capacity as the United States Attorney for the Southern District.

10.  Defendant James Comey, was the director of the Federal Bureau of Investigation, is a
government agency charged with the investigation of crimes in the United States. James
Comey is sued in his official capacity as the director of the Federal Bureau of
Investigation.

## FACTS

## THE MURDER-FOR-HIRE PLOT

11.   Anatoly Potik contracted with Boris Nayfeld to assassinate Oleg Mitnik in exchange for
the payment of One Hundred Thousand ($100,000) Dollars.

12.  In the summer of 2015,  Boris Kotlyarsky learned of Anatoly Potik's plot to murder Oleg
Mitnik and immediately informed Oleg Mitnik about the contract on his life between
Nayfeld and Potik.

13.  Boris Kotlyarsky never sought nor received any financial gain from Nayfeld or Mitnik a
fact that Nayfeld confirmed later under oath on October 12, 2016 when he entered a
guilty plea before Honorable Katherine B. Forrest, when he represented to the court that
Kotlyarsky never sought any financial gain from Nayfeld or Mitnik, nor had there ever
been any agreement or conspiracy between them.

14.  Nonetheless, on January 15, 2016 and despite a lack of any evidence whatsoever against
Kotlyarsky he was charged with extortion by a criminal complaint filed in the Southern
District of New York, Dkt. No. 1: 16-mag-0324, sworn to FBI Special Agent Luke
Hardison.

15.  On January 22, 2016 Potik was charged with MURDER-FOR HIRE in a criminal
complaint U.S. v. Potik, filed in the United States District Court for the Southern District
of New York and filed on January 22, 2016.

16.  The Government dismissed the Complaint against Potik on June 8, 2016 but not before filing a new criminal information against Defendant Potik with a lesser charge and before a different judge on June 7, 2016.

17.  In its application to seal the docket in that new case, the Government expressly cited Defendant Potik's safety and "active law enforcement operations and investigations" that would be in jeopardy if the docket were not sealed.

18.  The Government subsequently filed a superseding indictment with a different, lesser charge of "misprision of felony".

19.  When Defendant Potik attempted to plead guilty to that charge, Judge Hellerstein rejected his plea, holding in his September 16, 2017 Order Rejecting Plea:

> A defendant is permitted to plead guilty to a lesser offense where
> the Government offers him that choice, but the factual basis for that
> plea cannot be manufactured by the lawyers involved in the case;
> it must be based on reality. That basis in reality is absent in this case.
> For these reasons, I reject Potik's plea of guilty.

20.  On December 8, 2017 Judge Hellersetin denied Potik's motion for reconsideration, rejecting his attempt to plead guilty for the second time.

21.  On December 11, 2017, the Government filed nolle prosequi, choosing not to prosecute Defendant Potik for medical reasons.  While the Government dismissed its Murder-For-Hire Criminal Complaint against cooperating Defendant Potik, it continued to prosecute Kotlyarsky based on the very same Murder-For-Hire plot.

22.  The Government charged Kotlyarsky with extortion, without a shred of evidence, even

though he saved Oleg Mitnik's life by blowing the whistle on Potik's MURDER-FOR-

HIRE plot.   On July 27, 2017, Nayfeld was sentenced on two counts of Interference

with commerce by threat or violence, to which he pled guilty pursuant to his plea deal with

with the government and was sentenced to 23 months.


## THE GOVERNMENT VIOLATED BRADY V. MARYLAND; THE
## GOVERNMENT VIOLATED ITS DUTY OF CANDOR

23  On or about October 12, 2016, co-defendant Boris Nayfeld, in the course of entering his

guilty plea, appeared before Hon. Katherine B. Forrest and in his allocution under oath, he

represented to the court that Plaintiff had not sought any financial gain from him or from

Mr. Mitnik, nor had there ever been any agreement or conspiracy between Mr. Nayfeld and

Mr. Kotlyarsky that Mr. Kotlyarsky would receive any financial benefit for informing Mr.

Mitnik of the plot to kill him. As Mr. Nayfeld averred:

> THE COURT: What I want to know is did you agree with
> anybody else to try to extort money to take money from the
> son-in-law?
> THE DEFENDANT: (In English) No.
> See Exhibit 12, page 36, lines 11-13.
> ***
> THE COURT: And so Mr. Kotlyarsky then got Mitnik to give
> you and Mr. Kotlyarsky money?
> THE DEFENDANT: (In English) No. This is after Mitnik
> have for me –
> Exhibit 12, page 44, lines 4 – 7.
> ***
> THE COURT: All right. Kotlyarsky says that -- sorry. Mr.
> Potik says he's got a job for you and Kotlyarsky then indicates
> to you that if you just go to the potential victim --
> THE DEFENDANT: (In English) Yes.
> THE COURT: -- and tell the victim about Potik wanting him
> dead, the victim will pay you money and you and Kotlyarsky
> would then somehow divide up that money, correct?

THE DEFENDANT: (In English) Yes.
THE COURT: And that that actually happened.
THE DEFENDANT: (In English) **No, no, no. Listen. I'm not -- I want the truth. I not tell -- he not tell me that –**
THE COURT: Tell you?
THE DEFENDANT: **He did not want any money**. He said that -- he told me that you will make some money.
THE COURT: I see. So you and Mr. Kotlyarsky agreed that you would give the information to Mr. Mitnik.
THE DEFENDANT: (In English) Yes.
THE COURT: **But Mr. Kotlyarsky was not going to be paid?**
THE DEFENDANT**: No. No. It was my intention to share the money with him but he said no**.
Exhibit 12, page 44, lines 13 – 25 through page 46, lines 1 – 10 (emphasis added).

24   Despite the *prima facie* value of this evidence to Plaintiff, at the request of the Government, "particularly," in the Government's words, "because the upcoming trial includes a charge of witness tampering," the transcript and docketing of the hearing was ordered sealed.

25   . This exculpatory evidence was not released by the Government to Plaintiff, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and the transcript remains sealed to this day.

26   And in fact, the docket of Boris Nayfeld contains no entries from October 6, 2016 to April 5, 2017, and as such, Plaintiff was not even aware that any activity had occurred which might have had beneficial value with respect to his decision to enter into a plea agreement or for use at sentencing.

27   At a minimum, Judge Forrest anticipated that Hon. Lewis A. Kaplan would have access to the sealed transcript at some point after Plaintiff's trial, and presumably before sentencing.

28  But the evidence contained in Mr. Nayfeld's testimony never made its way to Judge

Kaplan.

29  Indeed, at Plaintiff's sentencing on May 31, 2017, Judge Kaplan observed that:

> **Although I don't have specific evidence before me to make an express finding -- and I don't** -- it seems to me that it would have been entirely reasonable to expect and, notwithstanding what I said already, more likely than not that you did expect that if Nayfeld was paid off, he would have something for you out of the payoff.
> **I understand there's been no express testimony or evidence that you and Nayfeld ever had a specific discussion or understanding**, but I do think the logic of the situation is such that that was your intent and expectation.

30  If not so previously, this is the point of no return where the Government should have

exercised its duty of candor to the tribunal, as more fully discussed. Here, the error lay in

the expressed belief held by the Court based on lack of access to testimony, the truth of

which was known to the Government.

31  The distinction is immaterial. In both cases, the Government's error lay in its silence in the

face of what it knows to be the truth, allowing the tribunal to proceed under a false

impression. Here, however, is evident the culpable concealment of exculpatory evidence

by the Government.

32  Given the revelations found in the sealed transcript of Boris Nayfeld's allocution of

October 12, 2016, as of the date of the Court's statement above on May 31, 2017, it cannot

be disputed that that the Government knew that there was "express testimony or evidence

that [Plaintiff] and Nayfeld ever had a specific discussion or understanding [regarding the

receipt or non-receipt of money by Plaintiff]" If the Court would have had access to Mr.

Nayfeld's exculpatory testimony, the Court would likely have rejected the Plaintiff's

allocution and plea, because it would not have made out all of the elements of an extortion under 18 U.S.C. § 1951(b)(2).

33   *United States v. Crispo*, 47 F. App'x 39, 40 (2d Cir. 2002) "To affirm the extortion conviction below there must be proof of (1) **intent to obtain the property of another**, with his consent, "induced by wrongful use of actual or threatened force, violence, or fear," 18 U.S.C. § 1951(b)(2), and (2) interference with interstate commerce." (emphasis added); *United States v. Enmons*, 410 U.S. 396, 419 n. 16 (1973): "Extortion requires an intent to obtain that which in justice and equity the party is not entitled to receive."

34   Plaintiff never had any intent to obtain the property of Oleg Mitnik.

35   In Oleg Mitnik's Declaration in support of Plaintiff's 2255 motion to set aside his sentence, Mr. Mitnik, the victim in this matter, makes the following statement:

> Based on those records and my knowledge of certain facts, I believe Mr. Kotlyarsky's sentence was based on a misapprehension of material facts.
> As such, I provide this Declaration to clarify the following relevant facts from my first-hand knowledge.
> After Mr. Kotlyarsky informed me of the murder plot, it was my idea, not his, for me to meet with the hit man, Boris Nayfeld. I asked Mr. Kotlyarsky, not the other way around, if he could arrange for a meeting between Mr. Nayfeld and me. I believe my initiating this request was recorded on a recording device provided to me by Special Agent Luke Hardison for the 12/3/2015 meeting between Mr. Kotlyarsky and me.
> From the onset (around late October 2015), Mr. Kotlyarsky told me that I should go to the police to get them involved. In early November 2015, I filed a complaint with my neighborhood police department. In mid-November 2015, my complaint was forwarded to an organized crime task force. Shortly thereafter, I met with federal authorities.
> At no point did Mr. Kotlyarsky ever ask me or lead me to believe that he expected in any way to be compensated financially for telling me about the murder plot, for arranging for the meeting with Mr. Nayfeld, or for his efforts in helping to save my life.
> Although Mr. Kotlyarsky and I did have a conversation about

business, it was a casual conversation, the type that any two business men may have, who have long been friends, are catching up after a time of absence, and who think well of and wish well for each other. The conversation was unequivocally disconnected from anything to do with the murder plot. Mr. Kotlyarsky was not a stranger to me. We have known each other for many years, and were from the same country, Russia. In the sentencing of Mr. Kotlyarsky, the prosecutor stated that "not only was [Mr. Kotlyarsky's] intervention not the reason [I am] safe, but in intervening at all, Mr. Kotlyarsky made it worse and, in fact, risked greater harm. As the victim, I can state unequivocally that this statement could not be further from the truth. I fully believe that but for Mr. Kotlyarsky's intervention, I would not be alive today. Contrary to the prosecutor's contention, Mr. Kotlyarsky did not take "advantage of [my] specific fear of death", but rather, he helped prevent my death.

The Court, after hearing the prosecutor's statements, concluded that "in one way or another, there would be an economic benefit to [Mr. Kotlyarsky] no matter how it turned out". Most respectfully, as the intended victim, as the person conversing with Mr. Kotlyarsky at that time, I do not see it that way. Mr. Kotlyarsky could have easily asked me for compensation given what he did, but he did not.

From what I understand, the Government presented no evidence from Mr. Nayfeld demonstrating any agreement between Mr. Kotlyarsky and Mr. Nayfeld in which Mr. Kotlyarsky would receive a portion of what I paid Mr. Nayfeld. **Indeed, my understanding is that the Government stated there was no financial gain for Mr. Kotlyarsky from Mr. Nayfeld.**

To me that speaks volumes, given that Mr. Nayfeld entered a cooperative agreement with the Government, requiring him to fully disclose the crime and answer all questions.

As such, there was no expectation of financial gain for Mr. Kotlyarsky from me, and no evidence of any financial gain for Mr. Kotlyarsky from Mr. Nayfeld. **The Court's conclusion was thus completely unfounded and in [sic] diametrically opposed to the truth of what happened.**

While I understand that Mr. Kotlyarsky pled guilty in a plea bargain, as I've stated before, I do not believe that Mr. Kotlyarsky should have been charged with extortion in the first place. I stated so at the time of his arrest, and my feelings on the matter have not changed. I told this to the Probation Officer who noted my statement in Mr. Kotlyarsky's PSR.

**It is my concerted feeling that Mr. Kotlyarsky's conviction and imprisonment, given the truth of what I know happened, and**

**given probable outcome had he not intervened, constitutes a gross miscarriage of justice.**

And just as disturbing to me is the severely disproportionate sentence imposed upon Mr. Kotlyarsky for his plea, compared to that of the mobster hit man, Mr. Nayfeld, and the mastermind financier of the murder plot, Mr. Potik.

Mr. Kotlyarsky, who saved my life, received a sentence of 41 months. In comparison, despite entering into a contract to murder me and subsequently extorting money from me to stave off the murder, Mr. Nayfeld was sentence by Judge Forrest to a mere 23 months. And despite conceiving, financing and setting in motion a murder plot against me, Mr. Potik somehow manipulated the Government to enter a *nolle prosequi!*

As a result, Mr. Kotlyarsky, whose intervention foiled the murder plot and saved my life, received a sentence nearly twice that of the hit man who intended to murder me, and the person who originally plotted and paid [for] my murder walks away scot-free.

Nothing could more closely constitute a gross miscarriage of justice to Mr. Kotlyarsky.

I repeat what I told the Probation Department. I do not believe that Mr. Kotlyarsky should ever have been charged with extortion in this case, and most certainly, at the age of 70, he should not have to serve 41 months of imprisonment, even if he did accept a plea bargain for reasons personal to him.

In the hopes that justice and sensibility may gain the upper hand in this case, I submit this Declaration in support of Mr. Kotlyarsky's motion.

I implore the Court to grant the relief requested by Mr. Kotlyarsky, and any other relief that may be just, fair and equitable.

36  If the Court would have had access to Oleg Mitnik's exculpatory testimony, the Court

would have rejected the Plaintiff's allocution and plea, because it would not have made out

all of the elements of a Hobbs Act extortion under 18 U.S.C. § 1951(b)(2).


37  If Plaintiff had had access to the exculpatory statements of Oleg Mitnik and Boris Nayfeld,

Plaintiff would have chosen to proceed to trial, rather than plead guilty.


As maintained by Plaintiff  from the beginning and even

through his plea allocution, the arrangement of meetings between Nayfeld and Mitnik were at Mitnik's request. "Meeting that I arrange happened in Brooklyn, but I arrange meeting because of ask him many times of Oleg Mitnik. He [Oleg Mitnik[ want to see this guy. Where it happen. In Brooklyn. It's on the request of Oleg Mitnik, this meeting was arranged."

38 As maintained by Plaintiff from the beginning and even through his plea allocution, Plaintiff did not want and was not expecting to make any money from saving Oleg Mitnik's life. "I would not expect to be paid any portion of the money Nayfeld would try to obtain from Mitnik. There was no financial gain for me at all." And "I'm sorry one more time. There is no financial or any other gain for me was in this case."

### THE GOVERNMENT'S BRADY VIOLATIONS, RESULTED IN THE GOVERNMENT CAUSING PLAINTIFF TO ENTER INTO THE PLEA AGREEMENT UNDER DURESS

42. More than a century ago, with respect to duress, *Brown v Pierce,* 7 Wall [74 US] 205, 214 [1869], The Supreme Court of the United States stated:

> "Duress, in its more extended sense, means that degree of constraint or danger, either actually inflicted or threatened and impending, which is sufficient, in severity or in apprehension, to overcome the mind and will of a person of ordinary firmness. (cited by *United States v. Ein Chem. Corp.*, 161 F. Supp. 238, 246 (S.D.N.Y. 1958)).

43. Here, the duress was the threat, to an innocent man, at the age of 69, of ten years of imprisonment.

> To make a case of duress by threat of imprisonment, it must be shown that the threat was so pressing that it overcame the victim's will and induced his act or promise. Baker v. Morton, 12 Wall. 150, 20 L.Ed. 262; *United States v. Huckabee*, 16 [**4] Wall. 141, 21 L.Ed. 457; *Dunham v. Griswold*, 100 N.Y.

42. As further stated in *Cortlex Indus's Meaning* 96 Civ. 6180. (CSH), 1995 U.S. Dist. LEXIS 9642, at *6 (S.D.N.Y. July 11, 1995):

224. 6 (S.D.N.Y. 1936)

> [D]uress by threat of a criminal prosecution for embezzlement or theft invalidates a contract induced thereby." 21 N.Y. Jur. 2d Contracts § 135. See also, Restatement § 176(1)(b) ("A threat is improper … if what is threatened is a criminal prosecution."). "It is immaterial whether such person was guilty or innocent of the act for which arrest or imprisonment was threatened in order for there to be duress." *Willig*, 438 N.Y.S.2d at 874. See also, Restatement § 176, Comment c.

43. Age is one of the factors to consider when determining the severity of the threat. See *Gottex Indus. v. Menczel*, 93 Civ. 6150 (CSH), 1995 U.S. Dist. LEXIS 9642, at *7 (S.D.N.Y. July 11, 1995).

44.  At age 69, Plaintiff was systematically led down the path of free man to incarcerated man for 41 months, despite the existence of freshly obtained exculpatory information provided to the Government by Boris Nayfeld, corroborated by the long-known statements from the victim himself, Oleg Mitnik.

45. The obligation under Local Civil Rule 1.6 to inform the court of related cases did not belong to trial counsel alone, but the Government as well ("It shall be the continuing duty of **each attorney appearing** in any civil or criminal case to bring promptly to the attention of the Court all facts which said attorney believes are relevant to a determination that said case and one or more pending civil or criminal cases should be heard by the same Judge…" (emphasis added).

46. The Government's failure to follow its related cases duty enabled its *Brady* violations and facilitated ideal duress conditions to obtain Plaintiff's plea agreement.

47. Sometime on or before October 1, 2016, an unidentified person informed the Government that Plaintiff had no expectation of receiving any money from Boris Nayfeld in connection with the alleged extortion or conspiracy to extort money from Oleg Mitnik. On October 1, 2016, without identifying who, the Government sent a letter to Plaintiff's counsel, attached as Exhibit 30, so stating: "[A] witness has informed the Government, in sum and substance,

that the defendant was offered direct payment in connection with the events described in the Indictment, but declined the offer."

48. The Government did not characterized the disclosure as a *Brady* disclosure[1]. As well, the "witness" was not identified in the Government's letter. Plaintiff had no way of knowing if it was Boris Nayfeld, Mr. Nayfeld's son, Oleg Mitnik, or some other yet unknown witness to the case.

49. But, as is later learned from the sealed October 12, 2016 Boris Nayfeld allocution transcript, it was Boris Nayfeld who provided the exculpating information to the Government. The Government, however, did not reveal this to Plaintiff.

50. Additionally, from the beginning, the Government also knew that the victim, Oleg Mitnick, did not believe that Plaintiff had violated the law or should becharged with this crime:

> The victim views Kotlyarsky as a middle man in this conspiracy. He explained that the defendant did not initiate the contract on his life, he told him about the contract, and he never asked for or expected to be compensated financially for telling him about the contract. The victim does not feel that Kotlyarsky should have been charged with attempted murder [sic – should be extortion]. The victim is upset because Kotlyarsky wants to sue him for accusing him of committing extortion, but he had "nothing to do with how the Government files criminal charges." The victim continues to fear for his life because his father-in-law has not been imprisoned. The victim believes that if it were not for Kotlyarsky interceding in this scheme, he would be dead.

51. Instead of fully disclosing the evidence to Plaintiff, on October 5, 2016, the Government issued a Superseding Indictment against Plaintiff, with the object of exerting greater pressure. The Superseding Indictment added Obstruction of Justice to the charges against Plaintiff.

52. Likewise the Obstruction of Justice charge had no merit and was based on a proposed affidavit that Plaintiff's lawyer, Tony Mirvis drafted based on the facts in the case.

53. At his plea allocution on October 12, 2016, Mr. Nayfeld testified that Plaintiff had nothing to gain and sought no financial gain. But the Government, using the new Obstruction of

Justice charge as a pretense that "the interests of justice would be served," asked the court to seal Mr. Nayfeld's plea transcript.

> The court granted the request:
>> THE COURT: *** Is there anything else we need to do?
>> MR. THOMAS: Two brief matters, your Honor. First, because this is, as the Court has recognized, an ongoing cooperation situation, and particularly because the upcoming trial includes a charge of witness tampering, the Government believes that the interests of justice would be served by sealing filings related to Mr. Nayfeld and delaying the docketing of these proceedings until the conclusion of the trial before Judge Kaplan, if one is held.
>> THE COURT: Mr. Tassone, do you have any view on that?
>> MR. TASSONE: I have no objection to the Government's request, your Honor.
>> THE COURT: Well, **I certainly have no reason to second guess sealing in this matter upon the basis that the Government has set forth. If there is an issue of potential witness tampering elsewhere, obviously we want to make sure that we have done what we can to prevent anything occurring here.** So, the proceedings will be sealed.
>> **Now, after the trial and assuming that the trial happens, this entire matter will get transferred over to Judge Kaplan and he would then be the Judge in charge of whether he wants to unseal it and what the terms of that unsealing would be.** If it remains in front of me, you will need to give me a time frame when the unsealing would potentially be accomplished and if the answer is never, then it is never. If the answer is two years, then it is two years. But, I always like to ask about that at sentencing. Okay? Because otherwise things sort of sit in sort of a limbo position for perpetuity. All right?

54. It is not clear what the exact connection was that the Government was making. According to the Government, they had already disclosed that a witness had informed the government that Plaintiff had declined any offer of payment. And they had already issued a superseding indictment charging Plaintiff with attempting to tamper with Boris Nayfeld's testimony.

55. As backdrop, the Government had offered a cooperation agreement to Anatoly Potik and Boris Nayfeld, as well as to Plaintiff. Anatoly Potik and Boris Nayfeld accepted. Plaintiff, however,

rejected the cooperation offer.

56. The Government knew that if it took Plaintiff to trial, the likelihood of success given Mr. Nayfeld's testimony coupled with that of Mr. Mitnik, and the lack of a viable nexus to interstate commerce, was slim.

57. Upon information and belief, the Government was not pleased with Plaintiff's refusal to cooperate and set out with new vigor to see to it that he was punished. Because Plaintiff had refused to be a cooperative witness, the Government affirmatively wanted the exculpatory evidence to be withheld from Plaintiff so that it could continue to pressure Plaintiff until he was left with no choice but to choose to accept a plea bargain under the fear that, because of the Government's spin on the case, he could conceivably be convicted of a crime he did not commit and serve out the remainder of his life behind bars.

58. On October 13, 2016, the day after Boris Nayfeld's plea allocution, with the knowledge that 1) the victim, Oleg Mitnik, believed that Plaintiff saved his life and should never have been arrested and charged, 2) Boris Nayfeld had just testified that Plaintiff had refused any form of payment, and 3) Boris Nayfeld's exculpatory testimony was safely sealed away until further notice, the Government successfully moved the District Court to have Mr. Kotlyarsky's bail revoked. Plaintiff was directly remanded to custody.

59. Plaintiff experienced great distress at having been summarily removed from the bosom of his family and confined to the MDC, Brooklyn solitary confinement. For the first time in this case, he experienced the reality that, despite his innocence, the Government's unchecked power could deprive him of his freedom.

60. Plaintiff spent the next nine days in contemplation of his fate.

61. On October 22, 2016, the Government issued a "current position" letter to Plaintiff via counsel.

The letter said, "[b]ased upon the calculations set forth above, the defendant's sentencing range is **97 – 121 months' imprisonment**" (approximately eight to ten years).

62.  The imposing prospect of coming out of jail at the age of 79 for a crime he did not commit instilled extraordinary fear in Mr. Kotlyarsky. He entertained the very real prospect of dying in prison, or, at best, emerging from prison on the eve of being an octogenarian, with no realistic expectation of any significantly meaningful life ahead.

63.  Allowing time for this to sink in, a few days later, the Government presented the first opportunity for Mr. Kotlyarsky to essentially incarcerate himself. The Government issued its first plea offer. The offer, on October 25, 2016, was 70 – 87 months – six to seven years. Mr. Kotlyarsky was given until the end of the next day to decide. To the 69-year old Kotlyarsky, even six to seven years was unpalatable and his state of mind was one of shock and denial.

64. Late the next day, on October 26, 2016, the Government issued a second plea offer of 41 – 51 months. The cover letter stated that the "plea offer expires at the end of the day on October 26, 2016." Mr. Kotlyarsky was given 2 hours to accept it.

65.; Boxed into the corner, irrational from the fear of ten years' imprisonment instilled in him through the Government's deliberated methodology, unaware of Mr. Nayfeld's exculpating testimony of October 12, 2016, encouraged by counsel who had, through inexcusable gross negligence, missed material opportunities to effectively assist him, under duress, Mr. Kotlyarsky took the lesser of the risks.

66. The threat of imprisonment until the age of 79, effectively exerted by the Government despite their knowledge of the exculpatory evidence, was so pressing that it overcame Mr. Kotlyarsky's will and induced his acquiescence.

67. Had he known of Boris Nayfeld's exculpatory allocution testimony, and had he not been

handled in the manner in which he was, he would not have accepted the plea deal.

### PLAINTIFF IS INNOCENT OF HOBBS ACT EXTORTION

68.      Plaintiff is charged with Hobbs Act extortion as defined by 18 USCS § 1951(b)(2). § 1951. Interference with commerce by threats or violence:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
> (b) As used in this section—
> ***
> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
> 18 USCS § 1951 (emphasis added).

69.      Plaintiff never used actual or threatened force, violence or fear to obtain the property of Mr. Mitnik or anyone else.

70. As stated in the Declaration of Oleg Mitnik, Plaintiff did not act with any intent to obtain any property belonging to him:

> At no point did Mr. Kotlyarsky ever ask me or lead me to believe that he expected in any way to be compensated financially for telling me about the murder plot, for arranging for the meeting with Mr. Nayfeld, or for his efforts in helping to save my life.
> Although Mr. Kotlyarsky and I did have a conversation about business, it was a casual conversation, the type that any two business men may have, who have long been friends, are catching up after a time of absence, and who think well of and wish well for each other. The conversation was unequivocally disconnected from anything to do with the murder plot. Mr. Kotlyarsky was not a stranger to me. We have known each other for many years, and were from the same country, Russia.

71. As well, as stated in the Declaration of Oleg Mitnik, Plaintiff had encouraged Mr. Mitnik to file a report with the police. And in fact, that is what Mr. Mitnik did.

> From the onset (around late October 2015), Mr. Kotlyarsky told me that I should go to the police to get them involved. In early November 2015, I filed a complaint with my neighborhood police department.

> In mid-November 2015, my complaint was forwarded to an organized crime task force. Shortly thereafter, I met with federal authorities.
> After Mr. Kotlyarsky informed me of the murder plot, it was my idea, not his, for me to meet with the hit man, Boris Nayfeld. I asked Mr. Kotlyarsky, not the other way around, if he could arrange for a meeting between Mr. Nayfeld and me. I believe my initiating this request was recorded on a recording device provided to me by Special Agent Luke Hardison for the 12/3/2015 meeting between Mr. Kotlyarsky and me.

72.    Intent is essential element of crime in violation of Hobbs Act (18 USCS § 1951). See, *United States v. Green*, 246 F. 2d 155 (7th Cir. 1957); cert den., 355 US 871 (1957); *United States v. Sweeney*, 262 F. 2d 272 (3d Cir. 1959).

73.  Under the conspiracy clause of 18 USCS § 1951, the Government must prove that the accused acted with an intent to join and cooperate in conspiracy to obstruct commerce by extortion; under clauses of § 1951 proscribing obstruction, delay, or attempt to obstruct commerce by robbery or extortion, general intent to commit those crimes is required. *United States v. Warledo*, 557 F. 2d 721 (10th Cir. 1977).

74. A Hobbs Act violation is specific intent crime; intent is essential element of offense and must be proved beyond reasonable doubt.

75.  Plaintiff's state of mind was that he believed by telling Oleg Mitnick about the Murder-for-Hire plot against him, he was giving his long-time friend an opportunity to avert that fate, thus saving his life.

76. Mr. Mitnik then set upon the course of action he thought best in saving his own life. He went secretly to the authorities so that they could help him record, document, and ultimately arrest Mr. Nayfeld and his father-in-law, Anatoly Potik, the prime mover and mastermind behind the Murder-for-Hire plot.

77. In fact, Mr. Mitnik had no idea the Government was going to arrest his friend: The victim does not feel that Kotlyarsky should have been charged with extortion….The victim is upset because

Kotlyarsky allegedly wants to sue him for accusing him of committing extortion, but he had "nothing to do with how the government files criminal charges." …The victim believes that if it were not for Kotlyarsky interceding in this scheme, he would be dead.

78. What ultimately happened is that Anatoly Potik and Boris Nayfeld cut deals with the Government and both are on the streets today. Regrettably, Mr. Kotlyarsky found himself enmeshed in a Governmental whirlwind from which he became unable to extricate himself because of prosecutorial fervor and misconduct in withholding Brady material.

79. By withholding the exculpatory evidence of Boris Nayfeld, the Government, manufactured the factual basis that Plaintiff was guilty of the crimes of Extortion and Conspiracy to Commit Extortion

80.    Accordingly, Plaintiff brings this action for violations of his Fourth Amendment rights, malicious prosecution and negligent infliction of severe emotional and mental distress that the Defendants' actions had caused and continue to cause him.

## COUNT I – 42 U.S.C. §1983
### Violation of the Fourth Amendment (Against All Defendants)

81. Each of the foregoing Paragraphs is incorporated as if restated fully herein.

82. Defendants Brady violations as outlined above led to the wrongful prosecution of Plaintiff; thus, violating Plaintiffs' rights under the Fourth Amendment to the United States Constitution.

83. As a proximate result of the above detailed actions of Defendants, Plaintiff suffered injuries including pain and suffering, emotional distress and mental anguish.

## COUNT II
### Fourth Amendment- Unlawful Detention

84. Each of the foregoing Paragraphs is incorporated as if restated fully herein.

85. As described above, Defendant the Department of Justice and the Federal Bureau of Investigation, under the directions of James Comey falsely arrested Plaintiff knowing that there was no probably cause to prosecute Plaintiff; these actions were motivated by malice.

86. Defendant the Department of Justice, under the direction of Preet Bharrera in his official capacity, subjected Plaintiff to judicial proceedings for which there was no probably cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

87. The actions stated herein violate the United States Constitution, specifically the 4th and 14th Amendments.

88. The misconduct described herein was undertaken by Defendants Bharrera and Comey within the scope of their employment such that their employer is liable for their actions

89. As a result of the Defendants actions Plaintiff suffered pain and injury, including emotional anguish, humiliation, fear, anxiety, and the loss of Plaintiffs' liberty and livelihood.

**COUNT III**

**Conspiracy (Against All Defendants)**

90. Each of the foregoing Paragraphs is incorporated as if restated fully herein.

91. In agreeing to falsely charge Plaintiff with a criminal offense without any reason to believe he had committed a crime, Defendants acted in concert with each other to intentionally deprive Plaintiff of his Constitutional rights under color of law.

92. In furtherance of this conspiracy, Defendant the Department of Justice took overt acts to suppress exculpatory evidence from the Plaintiff and the Court, all in violation of federal law.

93. The misconduct described herein was undertaken intentionally, with malice, willfulness, wantonness and reckless indifference to the rights of the Plaintiff.

94. As a result of the above-described wrongful infringement of Plaintiff's rights, he suffered damages.

95. The aforementioned actions of Defendants were the direct and proximate cause of violations of the United States Constitution, the Fourth Amendment and the Fourteenth Amendment.

## COUNT IV – STATE LAW CLAIM
## Malicious Prosecution

96. Each of the foregoing Paragraphs is incorporated as if restated fully herein.

97. As described above, Defendants willfully and wantonly initiated and continued criminal proceedings against Plaintiff without probable cause to believe that Plaintiff had committed the crimes charged.

98. The charges were instituted and continued with malice.

99. The Plaintiff pled guilty under duress, but was actually and objectively innocent.

100.     As a result of the Defendants conduct, Plaintiff suffered injuries including emotional distress.

## COUNT V- STATE LAW CLAIM                              Intentional
## Inflction of Emotional Distress

101.     Each of the foregoing Paragraphs is incorporated as if restated fully herein.

102.     Defendants' by their actions as alleged herein caused Plaintiff to experience intense fear, anxiety and mental suffering.

103.     Defendants' infliction of severe emotional distress, extreme fear, anxiety and mental suffering was negligent.

104.     Defendants are jointly and severally liable to Plaintiff for his injuries in an amount not less then $250 million dollars.

## **PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, Plaintiff respectfully requests:

A.  Compensatory and consequential damages in an amount to be determined at trial but no less than $250 million for losses incurred by Plaintiff;

B.  Interest on those damages;

C.  Such other relief as is just, fair and equitable; and

D.  A jury trial on all counts.

Dated: New York, New York
      October 30, 2020               Respectfully submitted,

                                              */s/ Irina Shpigel*
                                              Irina Shpigel, Esq.